HEARD APRIL TERM, 1879.

CASE No. 761.

DANIEL HAND v. THE SAVANNAH AND CHARLESTON RAIL-
ROAD COMPANY ET AL.

THE STATE, EX REL. THE ATTORNEY-GENERAL, v. THE SAME.

1. Under "An act to aid in the construction of the Charleston and Savannah
railroad," passed by the legislature of South Carolina in 1856, the
guaranty of the state was endorsed upon certain bonds of this railroad
company issued under the authority of this act. The act provided that
as soon as any such bonds shall have been endorsed as aforesaid for the
first section of the road as therein specified, "they shall constitute a lien
upon said section," including the road-bed, &c., "and the State of South
Carolina from the endorsing of the said bonds and by virtue of the same,
shall be invested with said lien or mortgage, without a deed from the
company for the payment by said company of said bonds, with the interest
thereon as the same becomes due." Upon the completion of the second
and other succeeding sections of said road, other bonds were to be
endorsed by the state, "but upon the terms and conditions hereinbefore
provided; and upon the endorsing of the said bonds the State of South
Carolina shall be invested with a like mortgage, or lien, without a deed
from said company, upon said stock, and upon said first and additional
section or sections," &c., "for the payment of said bonds and the accru-
ing interest thereon." And the act further provided that "when the
whole of said road shall be completed, the State of South Carolina shall
be invested with a lien * * * upon the entire road * * * for
the payment of all said bonds, * * * and for the interest accruing
on said bonds." *Held*, that the bonds when endorsed constituted a lien
upon the entire road as successively completed, which not merely enured
as an indemnity to the state against its guaranty, but vested in the state
as well for its own protection as for the better security of the bonds and
their coupons into whosesoever hands they might fall, and not available
to either one of the protected parties to the exclusion of the other. HAS-
KELL, A. J., *dissenting.*

2. The fifth section of the same act provided "that the state expressly
reserves the right to enact hereafter all such laws as may be deemed
necessary to protect the interests of the state, and to secure it against any
loss in consequence of the endorsing of bonds under the provisions of
this act, but in such a manner as not to impair the vested rights of the
stockholders of the company." *Held*, that the state did not by this section
reserve any power to destroy or postpone the lien created by this act to
secure the payment of the bonds thereby authorized.

3. Hence, a subsequent act, in so far as it attempted to postpone this lien, impaired the obligation of a contract with the holders of these bonds, and was to that extent void.

4. *Hand* v. *Railroad Company*, 5 *S. C.* 182, and *State* v. *Railroad Company*, 8 *S. C.* 129, explained.

5. In 1869 another act was passed by the legislature to enable the said railroad company, (which had been sold under a junior mortgage subject to the lien of the act of 1856, and purchased by a new company and its name changed to the Savannah and Charleston Railroad Company,) to rebuild its road, which had been partially destroyed during the war. By this act certain bonds were to be issued for money borrowed, and the state in this latter act assuming absolute control over the lien created by the act of 1856, directed that it should be postponed and become a second lien, as soon as the bonds so authorized under the act of 1869 were issued. And by the third section of the act of 1869 certain other bonds guaranteed by the state were to be issued in exchange for past-due coupons of the bonds of 1856, subject however to the provision that the bonds for money borrowed should have precedence of the lien of 1856. *Held*, that parties funding such coupons were bound by the terms of the act of 1869, and had surrendered all right to claim for such coupons or the bonds received in exchange therefor, the protection of the lien of 1856.

6. *Held further*, that by such funding they accepted the postponement of the lien of 1856, as to all bonds and coupons of the same class, owned by them at that time.

7. The doctrine of equitable estoppel discussed and explained, and cases reviewed, and the rules laid down governing estoppel by silence.

8. Parties holding bonds under the act of 1856 are not estopped from asserting for their securities a prior lien to the lien of 1869, because of their failure to oppose the passage by the legislature of the act of 1869.

9. Holders of 1856 bonds accepting payment of their coupons from the company after the rebuilding of the road, are not thereby estopped from asserting their rights under the act of 1856.

10. Nor can it be objected by the corporation or junior encumbrancers that holders of 1856 bonds have made no attempt to obtain payment from the state.

11. Nor would equity, in favor of the second lien bonds, require such bondholders to look primarily to the state for payment under its guaranty, upon the ground that they held a double security.

12. The 1856 bond-holders are not estopped from asserting their prior lien, because, knowing of the act of 1869, they, without objection, permitted money raised thereunder to be expended upon the improvement of the mortgaged premises.

13. Judgment cannot be rendered against the state upon its guaranty in favor of the holders of the redemption bonds issued under the act of 1869.

14. Holders of the redemption bonds of 1869 have no lien either under the act of 1856 or the act of 1869, the lien of the latter act securing only the bonds issued for money borrowed ; nor can they require the state as their

surety to set up the coupons received in exchange for these guaranteed redemption bonds, as against either the 1856 or 1869 bonds.

15. After the passage of the act of 1856 the corporation purchased from H. a body of land, part of which was needed for their road-bed, and gave their bond and mortgage of same date to secure the payment of the purchase money ; this was before the completion of the road, or of that section of the road where the land so purchased was situated. *Held*, that the mortgage to H. had precedence of the lien under the act of 1856.

16. At the time of the purchase from H. there was then outstanding a mortgage over the entire property of the company, given to certain trustees to secure the payment of bonds issued by the corporation. *Held*, that the mortgage to H., being for the purchase money, was a preferred lien upon the property covered by it, over the previously-executed mortgage to the trustees.

17. Under the act of 1869, the exemption from taxes theretofore granted to said company, was revoked by acceptance of that act, and the company were required to complete their road from Charleston to Savannah by January 1st, 1870, and it was further provided "that no tax shall be assessed or levied upon said road until the same shall have been completed." In March, 1870, the road was completed to such extent that by the use under lease of another railroad company's track for three miles, and by means of a ferry boat belonging to this company, freight and passengers were transported by the company from Charleston to Savannah. *Held*, that the company were liable to taxation for the year 1870 and all subsequent years. And for the payment of such claim, the state can in court demand a sale of the road.

18. Where part of a railroad is in this state and part in another, the court should order a sale of the entire road, so much thereof as lay in the other state being sold subject to the liens existing in that state.

Before WALLACE, J., Charleston, March, 1878.

For the previous history of these cases in this court, see, in the following order, 5 *S. C.* 182, 8 *S. C.* 207, 6 *S. C.* 307, and 10 *S. C.* 406.

These cases having been referred to William Alston Pringle, Esq., as special referee, he filed his report, in which he fully states all the questions of fact involved, and thoroughly discusses the points of law arising thereunder. The following are his conclusions of fact upon the matters determined by this court:

The Charleston and Savannah Railroad Company was incorporated by an act of the general assembly of the State of South Carolina, ratified on the 20th of December, A. D. 1853. 12 *Stat.* 271. On the 20th of December, A. D. 1856, (12 *Stat.* 543), the

legislature passed an act, of which the following is a copy. [The act is fully set out in the opinion of the court, and is therefore omitted here.]

Under this act the company issued six per cent. coupon bonds to the amount of $505,000, which were guaranteed by the state, according to the provisions of the act, of which guaranty the following is a copy :

The provisions of the act of assembly, passed December 19th, 1856, having been complied with by virtue of the authority therein contained, the full and complete payment of this bond is guaranteed by the State of South Carolina, and the faith and funds of the said state are hereby pledged to secure the payment of the principal thereof, and of the installments of interest due or to become due thereon.

(Signed)                T. J. PICKENS,
                                  *Comptroller-General.*

On January 1st, 1858, the company conveyed to I. W. Hayne, Edward Sebring and E. M. Beach, trustees, in trust to secure the payment of seven per cent. interest-bearing bonds, to the amount of $1,000,000, about to be issued, all its then present and future to be acquired property, and all franchises, rights and privileges of the said company, of, in, to or concerning the same. The said bonds were issued and sold to a large amount.

By an act of the general assembly, approved December 21st, 1865, (13 *Stat.* 368), the state authorized the company to borrow the sum of $500,000 upon a first mortgage of the property of the company, and for this purpose the state postponed the lien of the act of 1856, and directed that it should be a second lien on the said property of the company ; provided that the holders of the endorsed bonds of said company, and the judgment creditors of said company, consent and agree, in writing, that their bonds and judgment be postponed, and become liens on said road next after the state lien. But the plan of effecting a loan under this act failed from a number of causes.

By the result of the war the company was reduced to insolvency, the road broken up, the bridges destroyed, great part of

the iron was carried off and lost, and the road was no longer capable of being used.

· Under these circumstances the trustees, under the deed of January, 1858, at the suggestion of a number of the creditors representing bonds to the amount of $604,000, secured by that mortgage, proceeded, by virtue of the powers contained in the deed, to foreclose, and on the 20th of November, 1866, the mortgaged premises were sold, subject, nevertheless, to the lien created by the act of assembly of 1856. The advertisement under which the road was sold, stated that the bonds secured by that lien amounted in all to the sum of $505,000, bearing interest at six per centum per annum, payable semi-annually, and having an arrear of interest due and unpaid of about $140,000, and that the principal of the said bonds was due on March 1st, A. D. 1877. At the sale the road, subject to the above-mentioned lien, was purchased by G. W. Williams and others, for themselves and as trustees for their associates, for the sum of $30,000.

On December 21st, 1866, (13 *Stat.* 438), an act was passed to incorporate the Savannah and Charleston Railroad Company. This act, after reciting the charter previously granted to the Charleston and Savannah Railroad Company, the lien created by the act of 1856 to secure the payment of the bonds of the Charleston and Savannah Railroad Company, the mortgage to I. W. Hayne and others, the insolvency of the company and the foreclosure of the said mortgage, and purchase, by George W. Williams and others, for the use of the holders of the said bonds, granted a new charter to the said purchasers and their associates, by the name of the Savannah and Charleston Railroad Company, with all the usual powers and privileges of railroad companies. The twentieth section of the act expressly provides, "that the company hereby formed shall assume and be held liable for the payment of the six per cent. interest-bearing bonds whereon the guaranty of the state has been endorsed, and the lien of the state is, in every respect, preserved and hereby reaffirmed."

On January 29th, 1867, by a decree entered in the suit of *Charleston and Savannah R. R. Co.* v. *Hayne et al., trustees, et al.,* which was a suit originally instituted to enjoin the sale of the road by the trustees, under the mortgage of 1858, the sale by

the said trustees was confirmed, and it was ordered *inter alia*, that the said trustees should execute and deliver to the new corporation, the Savannah and Charleston Railroad Company, upon their paying and securing the purchase money in the manner therein directed and required, a conveyance of the mortgaged premises, advertised and sold on November 20th, 1866.

The new company was duly organized, took possession of the road, and endeavored to reconstruct the same. They attempted to borrow money for that purpose, but the lien of the act of 1856 defeated such attempt.

The condition of the road in 1869 is thus described by Mr. C. S. Gadsden, the engineer and superintendent of the road, Mr. Fisher, the treasurer of the road, and Mr. Campbell, whose evidence accompanies this report.

The road was in operation in May, 1869, to Coosawhatchie; the remainder of the road, some forty or forty-one miles, was destroyed, that is, all wooden structures, including bridges, were destroyed or useless, half of the iron of the road, for the forty or forty-one miles, was gone, having been carried away either prior to the evacuation of the line or subsequently. The road, beyond Coosawhatchie, was unproductive; the company had no means by which they could make up that portion of the road, without resources outside of the means of the road. At that time it would not have been practicable to make those forty miles available—the only means of raising money was by postponement of the prior lien. The road was first reconstructed as far as Salkehatchie, with money obtained from the hire of all the rolling stock to the South Carolina Railroad Company, for from $8000 to $12,000 per month, on a lease which ended in August, 1866, and as far as Coosawhatchie by iron, or the sale of iron, taken from the rest of the road beyond that point. The road rested at Coosawhatchie for more than a year, from the close of 1867, till May, 1869. The trains ran to Coosawhatchie as soon as the road was completed to that point. The country was broken up and the road made no earnings, except from local traffic, and had no surplus over expenses. The estimated value of the rolling stock at the close of the war was $94,450. Under these circumstances the company had no other means of repairing the road than by

a loan, but they were unable to effect this as long as the lien created by the act of 1856, in favor of the state, was the prior lien. The company, therefore, in 1869, presented a memorial to the legislature, setting forth a statement of the condition of the road, and praying that the state should consent that the company may secure, by a mortgage, to take priority of the state statutory lien, a new loan of $500,000, if so much should be necessary to rebuild and complete the road in the first place; and then, secondly, to pay off the arrears of interest now due on the six per cent. bonds guaranteed by the state.

The legislature referred this memorial to the attorney-general for his opinion as to the right of the state to postpone her lien and subordinate it to the mortgage, to be executed as prayed for by the memorial.

The attorney-general gave his opinion that the state had a right so to postpone the lien of the act of 1856.

Whereupon the legislature, on March 2d, 1869, (14 *Stat.* 201,) passed an act entitled " An act to enable the Savannah and Charleston Railroad Company to complete their road." The act is as follows:

" An act to enable the Savannah and Charleston Railroad Company to complete their road.

" SECTION 1. Be it enacted by the senate and house of representatives of the State of South Carolina, now met and sitting in general assembly, and by the authority of the same, That the Savannah and Charleston Railroad Company is authorized and empowered to borrow and raise the sum of not more than five hundred thousand dollars, to be used in extending and rebuilding their road, under the provisions of their charter.

" SEC. 2. That for this purpose the said company is hereby authorized and empowered to issue bonds to the amount of not more than five hundred thousand dollars, payable twenty years after the date thereof, with coupons attached for interest, at the rate of seven per cent. per annum, payable semi-annually.

" SEC. 3. That the said company is hereby further authorized and required to fund and redeem the coupons for interest of the bonds of the Charleston and Savannah Railroad Company, guaranteed by the state, now past due, and that may fall due on

or before the first day of September, eighteen hundred and sixty-nine, by issuing therefor an equal amount of their bonds, with coupons attached, with interest payable semi-annually, at the rate of seven per cent. per annum, and the principal to become due in twenty years after the date thereof; and the payment of the said bonds, so to be issued in substitution for interest coupons, shall be guaranteed by the state in the same manner, and as fully as the said original bonds of the Charleston and Savannah Railroad Company are now guaranteed, subject, however, to the provisions of Section 6 of this act.

"Sec. 4. The bonds hereinbefore authorized for rebuilding said road shall be used exclusively for the building thereof and the outfit of the same. No salary shall be paid to any officer of the said road out of the funds so raised by this act.

"Sec. 5. The said railroad company shall deposit the interest on all their aforesaid bonds, as it becomes due, with the financial agent of the State of South Carolina in the city of New York, and shall notify the creditors of the same by public advertisement in one newspaper in New York, one in Charleston, and one in Savannah; and if said company shall fail to pay the interest on its debt within six months after it shall have become due, or fail to pay or provide for the payment of the principal of its debt within six months after it shall have become due, it shall be the duty of the comptroller-general of the state, and he shall have the power to take immediate possession of said road, with all its appurtenances, and lease the same to responsible parties, who shall have control thereof until the general assembly shall, by law, provide for the settlement of the affairs of said company in the interest of all its creditors. The governor of the state is hereby authorized and empowered to appoint two directors to represent the state in the direction of said company.

"Sec. 6. That the present lien of the State of South Carolina on said road shall, upon the issue of the bonds provided for in and by the first section of this act, be postponed and become a second lien; which said second lien shall extend over and cover the whole road, its outfit and real estate, as fully as is already provided for by law. The said road shall be completed by the first day of January, eighteen hundred and seventy.

x

"SEC. 7. This act shall not be of force until the said Savannah and Charleston Railroad Company consent to the amendment of their charter, so that the property of said corporation shall be subject to taxation in conformity with Section 2 of Article XII. of the constitution, and said consent be certified, under the seal of said company, to the comptroller-general and secretary of state. Upon the filing of said consent the said charter shall be deemed and held to be modified in conformity with said section of the constitution ; *provided*, that no tax shall be assessed or levied upon said road until the same shall have been completed."

On July 1st, 1869, the Savannah and Charleston Railroad Company issued bonds to the amount of $500,000, under a mortgage to William Aiken, James Robb and G. W. Williams, as trustees, which recited the act of March 2d, 1869, and represented that it was a first mortgage on all the present and future-to-be-acquired property of the said company, not including, however, the chartered franchises, powers and privileges of the said company. This mortgage was duly recorded.

It is in evidence that the application to the legislature for a postponement of the state lien was publicly discussed in the newspapers, and was generally known.

The bonds issued under the mortgage of July 1st, 1869, were negotiated with the contractors who rebuilt the road, and for other purposes connected with renewing the road.

Besides these bonds the company, under the provisions of the third section of the act of March 2d, 1869, issued another class of bonds, to the amount of        , for funding and redeeming the coupons for interest of the bonds of the Charleston and Savannah Railroad Company, which fell due before September 1st, 1869. These bonds were guaranteed by the state, and were declared subject to the provisions of the sixth section of the act of 1869, which postponed the lien of the act of 1856, and declared that that lien should be a second lien on the road.

The shareholders of the Savannah and Charleston Railroad Company, at their annual meeting, held on the 8th day of February, 1871, authorized and directed the directors to issue bonds of the company to the amount of $300,000, payable twenty years

after their date, with interest, payable semi-annually, at the rate of eight per centum per annum.

The directors accordingly issued the said bonds, secured by a mortgage to Andrew Simonds, H. H. De Leon and E. Bates, of all the property of the company, its estate, rights, privileges and franchises in this state and Georgia, according to and under the sixth section of the charter of the company. The mortgage deed is dated March 21st, 1871, and is duly recorded.

As to the claims of the estate of G. A. Trenholm and Rev. W. T. Potter.

On March 14th, 1858, the Charleston and Savannah Railroad Company purchased from Nathaniel Heyward a tract of land called White Hall, together with adjoining tracts situated in St. Bartholomew's parish, containing in all eight hundred and twenty-two acres. Through the land thus purchased the Charleston and Savannah Railroad Company laid out their track and constructed their road, and the track thus laid out is the same now in the possession of and used by the Savannah and Charleston Railroad Company. In payment of this purchase, the Charleston and Savannah Railroad Company delivered to Mr. Heyward its four separate bonds, three of which were for the payment of $5000 each, and one for the payment of $4800.

And, to secure the payment of these bonds, the company mortgaged to Mr. Heyward the lands thus purchased from him. By subsequent assignments, the said bonds passed into the hands of G. A. Trenholm and the Rev. W. T. Potter. On August 14th, 1866, proceedings were commenced against the Charleston and Savannah Railroad Company in the Court of Equity, for the foreclosure of the mortgage by which the bonds were secured.

On November 20th, 1866, all the property of the Charleston and Savannah Railroad Company was sold, and subsequently all of the said property was conveyed to the new company, the Savannah and Charleston Railroad Company. The new company were not made parties to the proceedings commenced against the old company for the foreclosure of the mortgage on the White Hall tract. But on June 17th, 1875, G. A. Trenholm and the Rev. W. T. Potter, the assignees of the bonds secured by the mortgage of White Hall, intervened by petition in the case of

*D. Hand* v. *Savannah and Charleston Railroad Company*, setting up the mortgage and reciting the proceedings which had been taken, and which had ended in a decree for foreclosure and sale.

As to the claim of the state for taxes.

The sixth section of the act of March 2d, 1869, concludes as follows: The said road shall be completed by January 1st, 1870. The seventh section of the same act concludes as follows: "*Provided*, that no tax shall be assessed or levied upon the said road until the same shall have been completed."

In the opinion of Mr. Gadsden, the engineer of the road, and of Mr. Campbell, the road has never been completed; the connection with Savannah not being on its own track, the road cannot transport freight and passengers from city to city on its own track.

There is a satisfactory connection with Savannah at the Georgia end, but that connection does not belong to the road; the length of the road from the western bank of the Ashley river to the crossing of the Central Railroad of Georgia, is one hundred and one miles. A bridge across Ashley river was always contemplated.

The first plan was to cross Ashley river at Bee's ferry, and afterwards it was proposed to cross at other points. The road has not yet been completed at either end. The plans and estimates of the company and engineers contemplated a starting from this side of Ashley river, the eastern side, with a bridge over the river. The road has never entered Savannah on its own track. The terminus of the track of the road is three miles from Savannah. There are many estimates for a bridge over the Ashley.

On the part of the state the following facts were submitted:

The Charleston and Savannah Railroad, as originally projected, contemplated a bridge across the Ashley river on the west side of the city of Charleston. The line on which the road was finally built strikes the western bank of the river (which is there about one quarter of a mile wide) at a point just opposite the city itself. The depot, or place for receiving and delivering freight and passengers, was placed on the other side of the river (the eastern) within the limits of the city, and nearly exactly

opposite the terminus of the road, on the western bank. The road bed and track were finished and in condition for transporting freight and passengers before the bridge across the Ashley was constructed. The road, as then built, extended from the point mentioned on the western bank of the Ashley to a point a little more than three miles from the city of Savannah, where it met the line of the Central railroad. Beyond this point the Charleston and Savannah railroad never built any road bed or track. By an arrangement with the Central railroad they used the track and depot of the latter in common, and the Charleston and Savannah railroad ran their trains over this track to the depot, at a point within the corporate limits of Savannah. No bridge across the Ashley ever was built by the Charleston and Savannah Railroad Company. A bridge across the river was built shortly prior to the war by a company called the Charleston Bridge Company, at a point above the line of the Charleston and Savannah railroad.

At the beginning of the war the Charleston Bridge Company allowed the railroad to lay a track upon their bridge across the river, but the road itself never either owned or built the bridge.

The Charleston and Savannah railroad was in operation for some time before the bridge across the Ashley was built. Passengers and freight were carried to and fro over the railroad, and delivered and received at the depots already mentioned in Charleston and Savannah. The transportation over the Ashley river was effected in boats provided by the company and belonging to it, without any charge additional to the regular fare and freight over the road.

The track of the road, as laid over the bridge of the Charleston Bridge Company, ran continuously from the west bank of the river across the river on the bridge, and to the depot within the limits of Charleston.

This bridge across the Ashley, and a great part of the railroad itself, were destroyed during the late war, and the Charleston and Savannah railroad was sold soon after the close of the war, and purchased by certain persons who were afterwards incorporated as the Savannah and Charleston Railroad Company.

The bridge across the Ashley has never been rebuilt.

The road now is, and has been since March, 1870, in working order, and engaged in the transportation of freight and passengers between Charleston and Savannah.

The railroad company receives and delivers its freight and passengers at its depot in Charleston. The transportation across the river is effected under the care, responsibility and supervision of the Savannah and Charleston Railroad Company, in a large steamboat, the property of the company.

The passengers and freight are placed in the cars of the company on the western bank of the river, and in them transported to a point within the limits of the city of Savannah. In like manner, freight and passengers from Savannah to Charleston are received in Savannah, transported over the road to the end of the track, on the west bank of the Ashley, taken across the river in the company's steamer, and delivered at the depot in Charleston. The railroad company has, from time to time, advertised for through freight and travel, claiming that its connections were complete and its communications thorough.

Up to the year 1875, the arrangements with the Central railroad continued, the Savannah and Charleston railroad using the track and depot of the former. In that year a rupture occurred, owing to an alleged failure on the part of the Savannah and Charleston railroad to meet its engagements, and pay its rent for the use of the track and depot of the Central railroad.

Since that time a connecting line or track has been built from a point just across the point where the Savannah and Charleston railroad meets the Central railroad, to a point within or near the limits of Savannah, connecting with the line of the Atlantic and Gulf railroad; and this line is now rented by the Savannah and Charleston Railroad Company, who now make use of it for the transportation of freight and passengers. The road bed and track is not the property of the Savannah and Charleston Railroad Company.

The State of South Carolina, claiming that taxes were due from the Savannah and Charleston Railroad Company, has levied the following sums upon the road as taxes so due:    *    *    *    *

A bill was filed in the United States Circuit Court for the District of South Carolina, in March, 1872, by George N. Mil-

ler, a stockholder of the railroad, to enjoin the collection of these taxes. The injunction was refused and the bill dismissed. From the decree of the Circuit Court an appeal has been made to the Supreme Court, and the case is now on the docket.

The referee's conclusions of law were that the lien created by the act of 1856 was not merely for the indemnity of the state, but attached to the bonds themselves, and was a part of the contract with the bondholders; that in the fifth section of this act the state did not reserve any right to interfere with this lien; that the condition of the road could not authorize the state to postpone this lien; that the holders of 1856 bonds were not estopped from asserting their lien, because of their failure to object to the mortgage of 1869 and the sale of bonds thereunder; that the holders of the guaranteed redemption bonds issued under the third section of the act of 1869, by accepting these bonds, have accepted, as to them, the provisions of the act of 1869; that the claims of Trenholm and Potter are a first lien on the land described in the mortgage to Heyward; and that the consent of the railroad company to surrender its exemption from taxation, being in consideration of the postponement of the lien of the act of 1856, which was beyond the power of the legislature and inoperative, that the state was not entitled to her taxes. The report concludes as follows:

"Since writing the report I have been, on July 3d, 1877, served with the copy of a suggestion that the state retires as a party to these proceedings in all questions, except that in relation to the liability of the company for taxes. But if the principles of the report are correct, the retirement of the state will not affect the rights and relations of the other parties to the several actions."

### SUGGESTIONS OF ATTORNEY-GENERAL.

And now comes the State of South Carolina, by James Conner, the attorney-general, and gives the court to understand and be informed that the act entitled "An act to protect the interest of state whenever payment of interest now due remains unpaid on bonds issued by any railroad company, and whenever the guaranty of state is endorsed," approved March 7th, 1871, under

and by virtue of which proceedings were filed on the          day of          , 187  , by the attorney-general of the state, against the Savannah and Charleston Railroad Company, (*In re Hand v. Savannah and Charleston Railroad Company,*) has been repealed by act of the general assembly, approved the 23d day of May, 1877, and that the State of South Carolina is no longer a party to the proceedings in the above-entitled cause, or bound thereby, or by the judgment in the said cause, except so far as regards the claim for taxes due the state by said Savannah and Charleston Railroad Company, made and filed in the above-entitled cause.

JAMES CONNER,
*Attorney-General.*

To this report voluminous exceptions were taken by several parties before the court. Upon the report and exceptions, his Honor Judge Wallace rendered the following

### DECREE.

On hearing the report of W. Alston Pringle, the referee herein, and the argument of counsel, it is ordered that the report be confirmed and stand as the judgment of this court, except as will be herein specifically mentioned. In the judgment of this court, the lien created by the act of 1856 is vested in the state for the benefit of the holders of those bonds and coupons issued by the Charleston and Savannah Railroad Company, and guaranteed by the state according to the terms of that act, and for the payment of these bonds and coupons. It will not be necessary to inquire how far and in what manner this court might proceed to execute the trust so created, even if the state were not a party to these proceedings. According to the suggestions filed by the attorney-general, the state is a party, at least, as to all questions relating to the liability of the company for taxes and the lien for the same claimed by the state.

Neither will it be necessary to inquire how far the state may be a party for one purpose and not for other purposes.

In this case the state is a party seeking the enforcement of a lien upon the property of a company, confessedly insolvent, for

taxes, the payment of which cannot be had without a sale of the mortgaged property.

The state, therefore, must be considered as a party seeking a sale of the road and other property under the decree of this court, and is a party to this action in such manner and to such an extent as to be bound by the title to be given to the purchaser under its order of sale.

On account of the fact that more than half a million of dollars is represented by each class of the bonds which are respectively claimed to be the first lien, it is probable that no outside purchaser will be found, and it will become necessary for the bondholders to protect their respective interests at the sale.

How can this be done intelligently and effectively by either class of bondholders, unless the question of the priority of their claims has been finally adjudicated by the court of last resort? A part of the road lies in the State of Georgia.

It is not necessary at this time to inquire how much of the property of the company this court can order to be sold. It is sufficient to consider that such a question would cast a cloud upon the title at the sale, and that it is for the interest of all concerned that, when sold, the entire road and all the property of the company should be sold with a clear and unquestioned title to the purchaser.

It is to be presumed that the necessary proceedings will be instituted in the court of the State of Georgia for the adjudication of the rights of parties in the portion of the road lying in that state; and that by the comity of the respective courts, or by the agreement of parties, a time of sale, assented to in each jurisdiction, will be eventually fixed upon.

It is therefore ordered and decreed that all the property of the Savannah and Charleston Railroad Company included and described in the several deeds and mortgages proved in this case, and all the property of which the said company is seized and possessed, be sold by W. D. Porter, master, at such time and upon such terms and conditions as may hereafter be directed by the further order of this court.

It is further ordered that the Savannah and Charleston Railroad Company, and all the parties to these proceedings, and all

persons claiming under them, or either of them, be forever barred and foreclosed of all right, title, interest and equity of redemption in the mortgaged premises so sold.

And it is further ordered that out of the proceeds of sale the liens be paid by the said master, in the order and for the amounts (when amounts are set down) recommended in the report of the referee, except as to the claims of W. D. Gillison, Thomas H. Gregorie, the heirs or devisees of Thomas W. Gillison and Frederick R. Blake, in relation to which claims an order in the cause has been signed, bearing date April 24th, 1878, based upon a compromise of said claims by the parties thereto.

It is further ordered that if, after paying the liens according to the orders herein established, there should be a balance in the hands of the said master, the same be held subject to the further order of this court.

It is further ordered that all the parties to these proceedings have leave to apply at the foot of this decree for all necessary papers.

From this decree appeals were taken by the several parties against whose interests it operated; the grounds whereof will appear from the opinion of the court.

*Messrs. T. M. Hanckel, W. H. Brawley* and *I. M. Bryan,* for respondents.

*Messrs. J. B. Campbell, A. G. Magrath, C. G. Memminger,* and *Rutledge & Young,* for 1869 bondholders.

*Mr. L. F. Youmans,* Attorney-General, for state.

*Mr. E. McCrady,* for redemption bondholders.

*Messrs. James Conner* and *A. G. Magrath,* for Trenholm & Potter.

September 30th, 1879. The opinion of the court was delivered by

WILLARD, C. J.   The nature of the various questions arising in these cases, and the facts bearing upon them, are fully stated

in the report of the referee, and it is unnecessary to recapitulate them. The various questions for decision will be separately stated and considered, and their bearing upon the judgment pointed out.

The first question involves the construction of the act of 1856, (12 *Stat.* 543,) entitled "An act to aid in the construction of the Charleston and Savannah railroad." The parties who contest such construction are as follows : 1. The Savannah and Charleston Railroad Company, a corporation distinct from the Charleston and Savannah Railroad Company, that has succeeded to the property formerly belonging to the Charleston and Savannah Railroad Company by purchase under title derived through a sale for foreclosure of a mortgage made by the Charleston and Savannah Railroad Company to certain trustees for the benefit of a specified class of bondholders, and has received from the legislature corporate franchises by that name to maintain and operate the railroad originally conceded to the Charleston and Savannah Railroad Company. The new company is a party defendant to each of the suits above entitled, while the former company is not made a party. 2. Certain bond and coupon-holders, creditors of the Charleston and Savannah Railroad Company, the former corporation, claiming to have liens on the property in suit prior to that under which the defendant corporation claims to have purchased and hold the same. For convenience these creditors will be designated the bond and coupon-holders of 1856. 3. Certain bond-creditors of the defendant corporation, asserting liens ; and, 4. Certain judgment and other creditors of the original corporation claiming to have liens thereon.

The sections of the act of 1856 immediately involved in the present question of construction are the third, fourth and fifth. The object of the act is well stated in the title to be "to aid in the construction of the Charleston and Savannah railroad." The aid offered by this act consisted chiefly in the voluntary offer of the state to become an endorser on certain bonds of said company, intended to be issued for the purpose of finishing the construction of the road by providing and putting down iron rails, chairs and spikes, and providing an equipment for said

road. Certain conditions are annexed to the offer of the state; first, there must be *bona fide* subscriptions to the capital stock of the company " to an amount sufficient to grade, bridge and prepare for the iron rails fifty-one miles of the said road;" second, " such subscriptions must be shown to the governor of the state to be good and solvent;" third, " at least twenty miles of the road must be fully prepared for putting on the iron rails and equipments, and the governor notified thereof;" and it must appear, by certain evidences, that such section and every part thereof is free from any lien whatsoever other than that created in favor of the state by this act. Upon compliance with the foregoing requirements the governor is directed by Section 1 to " cause to be endorsed, by the comptroller-general, upon the bonds of said company, to an amount not exceeding $5000 per mile of said section, the guarantee of the State of South Carolina, pledging therefor the faith and funds of the state, which bonds shall be payable at such places in the United States as the president of the company may designate, bearing an interest of six per centum per annum, payable semi-annually, and not having more than twenty years to mature." The second section confines the application of the sums borrowed upon these bonds to certain defined purposes, namely, " for procuring the iron rails, chairs, spikes and equipments for said section of said road, and for putting down said iron rails."

Then follows the third section, which is as follows : " That as soon as any such bonds shall have been endorsed, as aforesaid, for the first section of the road, as aforesaid, they shall constitute a lien upon said sections so prepared as aforesaid, including the road-bed, right of way, grading, bridges and masonry, upon all the stock subscribed for in said company, and upon said iron rails, chairs, spikes and equipments when purchased and delivered; and the State of South Carolina, from the endorsing of the said bonds, and by virtue of the same, shall be invested with said lien or mortgage, without a deed from the company for the payment by said company of said bonds, with the interest thereon as the same becomes due."

The fourth section provides : " That when the said company shall have prepared, as aforesaid, a second section, or any addi-

tional number of sections, of twenty miles each, of said road, connecting with the section already completed, for the iron rails, chairs, spikes and equipments, as provided in the first section of this act, and the governor shall be notified of the facts, as before provided, he shall in like manner cause to be endorsed for said company like bonds of the said company to an amount not exceeding $5000 per mile for each and every section of twenty miles of said road so prepared as aforesaid; but upon the terms and conditions hereinbefore provided, and upon the endorsing of the said bonds, the State of South Carolina shall be invested with a like mortgage or lien, without a deed from said company upon said stock, and upon said first and additional section or sections of said road so prepared, upon the rails and equipments put or to be put upon the same, for the payment of said bonds and the accruing interest thereon : *provided,* that if the last section of said road shall be less than twenty miles, bonds of the said company shall be endorsed, as aforesaid, for such section for an amount in proportion to the distance, as provided in this act, but upon the same terms and conditions, in all respects, as required in regard to the bonds to be issued for the other sections of said road. And when the whole of the said road shall be completed the State of South Carolina shall be invested with a lien, without a deed from the company, upon the entire road, including the stock, right of way, grading, bridges, masonry, iron rails, spikes, chairs and the whole superstructure and equipments, and all the property owned by the company as incident to or necessary for its business for the payment of all said bonds, endorsed as aforesaid, as provided in this act, and for the interest accruing on said bonds. And after the governor shall have caused bonds to be endorsed, as provided in the first section of this act, for the first section of the road, it shall not be lawful for said company to give, create or convey to any person or persons, or body corporate whatever, any lien, encumbrance or mortgage of any kind which shall have priority over, or come in conflict with the lien of the state herein secured; and any such lien, encumbrance or mortgage shall be null and void as against said lien or mortgage of the state; and the said lien or

mortgage of the state shall have priority over all other claims existing or to exist against said company."

Section 5 provides " that the state expressly reserves the right to enact hereafter all such laws as may be deemed necessary to protect the interests of the state, and to secure it against any loss in consequence of the endorsing of bonds under the provisions of this act, but in such manner as not to impair the vested rights of the stockholders of the company."

The question now to be considered upon the construction of this statute is whether the lien designed to be secured thereby was intended exclusively as an indemnity for the state in case it should be called upon to pay the bonds so endorsed, or interest upon the same, or whether it was intended as a general security, collateral to the bonds so endorsed, to accompany them into the hands of the contemplated purchasers of such bonds as a means of charging the indebtedness arising upon such bonds, for principal and interest, on the property embraced by such lien as if mortgaged for that purpose.

The direct expressions of the act, in this respect, should be first noticed, and when their primary force is ascertained it will be competent to inquire whether the rules of construction demand that such primary sense should be modified by enlarging or narrowing the same to conform to any peculiar sense for such direct expressions. The language of the act must be considered with reference to three divisions of the subject matter; first, with reference to the first section of twenty miles; second, with reference to the succeeding sections of twenty miles each, and the final section of twenty miles, or a fractional part of that distance; and, third, in reference to the road, as a whole, upon the completion of each part of it. It may here be observed that the act assumes to look to the completion of at least fifty-one miles of the road, by the terms of the conditions imposed, as adequate means to bring that portion of the whole road to the condition stipulated for, prior to the actual endorsement of the bonds, are required to be provided by means of *bona fide* subscriptions to the capital stock of the road, good and available for that purpose.

It must then be considered that the construction of the whole

road, as a single object, was the intention of the act, and that its division into sections of twenty miles each was solely intended for the convenience of the corporation. From this circumstance it must be concluded that the terms employed to describe the character and intention of the lien, effected on any single section of the road, must be regarded as applicable to the entire lien as affecting the whole road, unless a contrary intent appears in the terms of the act.

The terms used in regard to the first section of twenty miles must be regarded as characteristic of the intentions of the parties as to all the succeeding sections. It is clear that a single indivisible lien on the entire road, when completed, was intended ; so that each bond issued, for any part of the work, should have its proportional interest in the whole property subject to the lien. This appears directly from the language of the fourth section, that " when the whole of said road shall be completed the State of South Carolina shall be invested with a lien, without a deed from the company, upon the entire road," &c. It is also a necessary inference, from the general character of the transaction, inasmuch as the value of the road depends upon the union of its parts, and division, for the purposes of security, would impair that value.

The third section declares " that so soon as any such bonds shall have been endorsed, as aforesaid, for the first section of the road, as aforesaid, they will constitute a lien upon said section," &c. Here is the expression of a direct intent that the bonds shall, when endorsed, " constitute " a lien. There can be no mistaking the sense of these terms. If it had been said that a judgment, when recovered, should constitute a lien on certain property, there could be no doubt as to the intention. The judgment itself would conclusively evidence the existence of such lien, and, therefore, in legal language, would be said to constitute or create such lien. In the same sense the endorsed bond conclusively evidences the existence of such lien, and, with equal propriety, may be said to constitute or create such lien. The word " they " can have no other sense than that of describing the endorsed bonds as that which shall constitute the lien in question. It is important to determine with accuracy whether

this is the true sense of the act, for, if it is, certain consequences tend naturally to follow it, which must be admitted unless precluded by other matters contained in the act. The most important of these consequences is that if the bond constitutes the lien, then in the strictest sense the lien is accessory to the bond, and must follow it into whosesoever's hand it goes.

But it is contended that this is inadmissible in view of the language that follows in regard to the first section of the road, and is, in substance, repeated as to the other sections succeeding. This language is as follows: "And the State of South Carolina, upon the endorsing of said bonds, by virtue of the same, shall be invested with said lien or mortgage, without a deed from the company, for the payment by said company of said bonds, with the interest thereon, as the same becomes due." It is contended that this language evidences an intention that the lien should enure exclusively to the benefit of the state to indemnify it against loss by reason of its endorsements of the bonds of the corporation, and that such being its intent, the language quoted above, to the effect that the bond, as endorsed, shall constitute the lien, cannot have that sense, as it would necessarily be contradictory of such exclusive purpose. The argument presents two considerations; first, whether the language on which this argument is based was intended to describe the character and object of the lien, and, second, whether it indicates any such exclusive intention as that ascribed to it. As it regards the first of these inquiries it will be observed that if the clause stood by itself it would be impossible to determine what was the nature of the lien or the character of the property upon which it was intended to take effect. All these particulars had been previously described when defining the effect of the endorsed bonds upon the property of the corporation. That was the part of the section that dealt with the creation of the lien, while the subsequent language only shows in whom the lien shall vest, at what time, and for what purpose.

There were two good and sufficient reasons why, assuming that the declaration that the endorsed bond should constitute a lien has the force and effect already ascribed to it, and is that due to its primary sense, it should be followed by such a pro-

vision as that which declares that on a certain event such lien should vest in the state for certain purposes. In the first place the title was in the corporation and not in the state, and it was the clear intention of the act that the lien should arise out of the terms of the act alone, on the happening of the event that called it into existence or constituted it, as expressed by the declaration that it should be a lien or mortgage without a deed from the company. It may not have been necessary, but it was strictly proper that the state should in terms invest itself with that which it assumed to dispose of by its own authority, by a declaration that would have that effect in virtue of the acceptance of the benefits of the act by the corporation. The state cannot effectually grant the lands of A to B, or create a lien on the lands of A in favor of B, except where it is done either with the consent of A or in aid of judicial remedies against him. The naked declaration that in a certain event B should have a lien on the lands of A in an act by which B was bound, by his acceptance, might, by implication, be held self-executing, by transmitting such title or right on the happening of the event contemplated ; but that accuracy which is desirable in statutes interfering with rights of property of the citizen was better attained by the adoption of a course which would have been necessary had it been a transaction between private persons intending to confer rights on third persons not parties to the original transaction. The other reason for adopting this form of proceeding, consistently with the idea that the endorsed bonds, in themselves, constituted the lien, is that the bonds, after being endorsed, were to be placed in the hands of the corporation to be disposed of as they might think best under their charter, so that, if finally sold to third parties, there would be an interval of time after the endorsement of the bonds and before such third persons would be in a position, by their purchase,.to be invested with such lien. During this period of time the state would be without a lien for its own security, unless such lien was brought into existence at the moment of the endorsement of the bonds and prior to their passing into the hands of purchasers ; and, as at that moment the state was the only existing party that could be invested with such lien, the language employed in the act was a reasonable

Y

and proper provision, assuming that the lien was originally intended as well for the bondholders as the state. Then, unless the language under immediate consideration indicates an intention that the state shall have an exclusive lien for its own protection, it must be concluded that the whole provision of Section 3 is harmonious with the declaration that the endorsed bond shall constitute a lien. Having found the form of the transaction to afford nothing in conflict with any construction, it remains to consider whether the language under consideration imports such an intent for the exclusive advantage of the state as that contended for.

This inquiry will not be confined to the particular language in question, but we will inquire whether there is anything in the whole act, or its parts, that forces the conclusion that the state was to derive exclusive advantage from the security taken. If it was clearly manifest that good faith and fair dealing demanded such a construction, that would constitute a pole-star to guide us in this inquiry.

The appellants strive to make such a case by showing that, under transactions that have occurred since the acceptance of the act of 1856 and the issuing of the bonds contemplated thereby, parties have acquired interests, in favor of which good faith demands that a certain construction of the act of 1856 should be upheld. But the same construction should be put upon the act of 1856, at the present time, that would have been appropriate at the moment of its passage, and at that time the considerations of fair dealing, that are so strenuously urged, had no existence.

Does, then, the language vesting the lien in the state, without the mention of any other parties, imply an intention to hold such a lien for its exclusive protection? That such is not a necessary implication is evident from the fact already noticed, that these words have an office giving them full efficacy independently of any such implication. If any such implication as that contended for can be admitted, it must rest on its reasonableness. It is hardly necessary to say that the direct expressions employed do not lead to any such conclusion; for, the fact that the lien was vested, in the first instance, in the state alone, has already been accounted for as necessary under the circumstances of the case,

on the assumption that a security was intended directly for the bondholders. We are required to say that the vesting of the lien in the state means that the state shall have it exclusively, notwithstanding other portions of the same section of the act indicate an intent that it shall enure to the benefit of the bondholder. That part of the section that vests the lien in the state sets forth the object for which the lien was created and vested, namely, a security for the payment of the bonds and interest. Now, in the payment of the bonds and interest, not only the state but the bondholders were interested, and if security is given for the performance of a particular act, why should it not enure to all interested in the performance of the act, whose interests were the subjects of consideration and protection in the transaction that gave origin to the security?

It is not enough to say that the bondholder is not mentioned, and, therefore, must be excluded, for the previous declaration of the section, making the endorsed bond the agent for constituting the lien, fairly includes the bondholder, and now something must be found that as positively excludes him. If, then, a declaration equivalent to an expression of an intent that the bondholder shall have security is followed by a provision, the effect of which is to uphold a lien in the hands of the state until the rights of such bondholder shall come into actual existence, and by which it is further declared that the object of the investing of such lien is the obtaining security for the payment of the bonds, how, then, can such provision operate to exclude the bondholder when payment in its usual sense is an act in which he has an interest? If a private individual had stood in the place of the state, and the terms of the act had been the terms of a private contract, there can be no doubt that as such contract, in effect, created the rights of the bondholders, such as might, on the contingency contemplated, arise, such terms would be held to amount to a declaration of trust in favor of the after-springing rights of the bondholder, and the surety could not be regarded as holding, subject merely to a general equity of subrogation. It would be anomalous if the creator of rights should be freed, by the operation of implication alone, from all concern for their preservation and protection. All the learning that has

been brought to bear in this case has neither illustrated nor suggested any such proposition. But much stress has been laid upon the fact that in the present instance it is a sovereign that is dealing with a subject, and not persons standing on the same footing in terms of equality. That circumstance, it is conceived, makes against instead of in favor of the appellant's arrangement. Had this been a contract between private persons, conceived in the terms of the act, the legal title to the lien would doubtless have vested and remained in the party standing in the place in which the state now stands; but a trust would, doubtless, have arisen in favor of the future bondholder upon the coming into existence of such an interest. The reason why the legal title would remain in such party arises from the nature of instruments for the conveyance of an interest in land. A statute, as an assurance, is not subject to the limitations that affect deeds between individuals. It may create an estate or interest in the lands *in futuro* as well as *in presenti*, and in persons not *in esse* at the passage of the law, as well as those in being and in the direct contemplation of the statute. Equity often raises a trust on the idea that parties having a certain interest were powerless under the forms of law to effectuate directly that interest. Such want of efficiency cannot be predicated of a statute, and, therefore, the necessity of raising and upholding a trust cannot arise, as a better result can be reached by construction without the aid of equitable invention. The foregoing observations properly relate to passive trusts, for active trusts depend upon a different principle, by which the judgment and skill of one may be made available for the benefit of another. Passive trusts are to be regarded as a mere form of assurance to aid defects in the formal methods in use.

There was nothing to prevent the title acquired by the state in the lien or mortgage from passing under the operation of the statute directly to and vesting in the bondholder according to the extent of his interest, and, therefore, there was no inconsistency in creating a lien, attached to a bond, that may pass from hand to hand, and vesting that lien in the state; but it was eminently proper at a time when the interest of the state under such lien was the only existing interest, and a cover to all that should sub-

sequently arise out of that transaction. Much stress is laid on
the fact that at the time this act was passed the financial credit
of the state was such as to preclude the idea that one dealing
with the state would desire any further security than that
afforded by that credit. There is a difficulty in drawing such
an inference consistently with the rules of interpretation, but if
it should be successfully drawn it would not be sufficient in itself
to change the sense of terms used in a statute in other respects
free from doubt. When it is considered that a demand against
a state cannot be enforced by any legal means by an individual,
it is evident that the inference thus pressed upon is based on a
sentiment mainly, if not altogether, and, as such, cannot be
brought to the standards of legal measure. It certainly does not
draw its whole force from an assumed idea that undoubting con-
fidence in the fact that payment will be made at maturity leads
to the disregard of securities, for such security is often afforded
by the personal credit of individuals of great and sure wealth
and probity, yet that circumstance would not be permitted to
create exceptions to the rules and presumptions of law in favor
of such persons. The argument must rest in the strength of the
sentiment of patriotism, either wholly or to a large extent, and
in that case is beyond the class of circumstances upon which the
law models its rules and presumptions. It has not been argued
that there is any inconsistency in the state as a sovereign and an
individual having a mutual interest in a security, nor could that
question present itself where such mutuality was created by the
sovereign himself. It must be concluded that the language of
the third section relating to the first section of the road of twenty
miles completed is clear, and that it creates a security intended
and available both for the state and the bond and coupon-hold-
ers under that section, and that neither of such protected parties
can exercise exclusive authority over such security. It remains
then to consider the language of the fourth section in its bearing
on this question.

The provisions of the third section as it regards the character
and object of the lien are substantially repeated in the fourth
section, but the clause providing that the endorsed bonds should
constitute a lien are omitted. This omission applies to the sec-

tions of twenty miles succeeding the first completed, and to what is finally said in regard to the entire road being chargeable on completion. In all these cases the intention is clearly expressed that the security taken shall be for the payment of the bonds. It is in no case said that it is taken for the special indemnity of the state as endorser. That is undoubtedly implied; but the direct provision is for the payment of the bonds. A provision for the payment of bonds is primarily a security for those holding the bonds. It is always so in equity, and at law when its forms permit it. The foregoing view is consistent with the circumstance that the security was demanded by an endorser or surety for the payment of the bonds in the very event that he desires to have brought about. An inference applied to such a case that the surety would prefer to pay the bonds himself and have recourse to the security for his indemnity, and for that purpose to hold the security for his exclusive benefit, has no foundation in law or fact. It must be concluded that the provisions of the fourth section of the act, in regard to the object of the lien or mortgage stipulated for, are not only consistent with the idea that the bondholder should have the benefit of the security conjointly with the state, but bear that sense upon their face. It is, therefore, competent to refer the language of the fourth section to that of the third for a full understanding of the terms of the statute, and thus to satisfy the rules of construction that demand that all that appertains to a single object or purpose should be harmonized together. Such being the case, no further need of comparing the various provisions of the third and fourth sections of the statute exists, and it must be concluded, so far as it regards these sections, that the bonds issued under and in conformity to that act were entitled to the lien or mortgage created by that act at the issuing of such bonds, and that unless that right has been lost through subsequent events, it still remains perfect. It must also be concluded that this indemnity extends to the holders of detached coupons with like effect as to the holder of the bonds. *State* v. *Spartanburg and Union Railroad Company,* 8 *S. C.* 129.

The next question upon the construction of the act of 1856 arises out of the fifth section of that act, which is as follows:

"That the state expressly reserves the right to enact hereafter all such laws as may be necessary to protect the interests of the state, and to secure it against any loss in consequence of the endorsing of the bonds under the provisions of the act, but in such a manner as not to impair the vested rights of the stockholders of the company." It is contended that the true construction of this section secures to the state unlimited control over the lien created by the previous sections of the act as against the bond and coupon-holders claiming thereunder.

The question that presents itself is, is this a reservation of power as against the bond and coupon-holders? It may be conceded at once that it was competent for the state, in the act creating the lien, to reserve to itself authority to dispose of or destroy the lien at its pleasure; the important question is, has it done so? There are two features of this section that are the key to its construction; first, the declaration of the object of the reservation, namely, to protect the interests of the state as affected by its endorsement of the bonds of the company; and, second, the character of the persons whose vested rights should be regarded as limiting the exercise of the power reserved, namely, the stockholders of the company. These provisions serve to define both the character and the limits of the authority thus reserved. We may well look to the character of these provisions, and endeavor to understand what is implied in them as a means of approaching the direct expressions creating the reservation of power. Presumably the "interests of the state" are those disclosed by the act itself, or such as may be properly connected with the matters to which the act relates. If it means more than this, and reserves the right to deal with all the corporate rights and franchises of the company by general legislation, without limitation as to the object in view, and subject only to the limitation in favor of stockholders, then there is the strongest reason for holding that the reservation is made against the railroad company alone.

If, however, it be considered as a reservation against the rights created under the act, and thus against bond and coupon-holders claiming thereunder, then it cannot be regarded in any other light than that above stated, namely, as intended to operate upon

the interests recognized by the act itself. What are those interests? They may be summed up in these words: *The payment of the bonds and coupons.* It certainly does not mean that the state may pass a law arbitrarily canceling its obligation as surety on the bond, for this might be done without impairing the vested rights of stockholders of the company as such. There are but two constructions that can be put upon this section, namely, that it does not affect the bondholders, or else it is a reservation of unlimited power as against them, and, in the latter case, it would include the right to cancel the obligation of the state. As far as the company is concerned, it saves the rights of the stockholders; and if it is to be regarded as a reservation of power as against the bondholders, its unlimited character, as such, could be argued from the silence of the act as to their vested rights, while expressly reserving those of the stockholders of the company. It is more reasonable to conclude that it was not intended directly to affect the rights of bond and coupon-holders, rather than that it was intended to remove all the protection that well-ordered governments seek to throw around such rights. We must conclude, then, so far at least as it may either directly or indirectly affect the rights of bondholders, that the language disclosing the object of the reservation confines it to such measures as may be deemed necessary to protect the interests of the state, as it regards the full and fair application of the property on which the lien was imposed to the payment of the bonds and coupons. Under this view the interests of the state and that of the bondholders were identical, and the protection of the one was the protection of the other, and the reservation of power contemplated only the acquisition of the most ample means of carrying out all the provisions of the act as intended by it, and thus was a reservation in favor of rather than against the bondholders. This section, like all others in the act, must receive construction, as well as give it to other parts, so that the act, as a whole, may be reasonable and consistent with itself. The appellant's argument, on the contrary, seems to make this section the arbiter of the construction of the entire act; that all else that the statute contains must bend to it, while it can undergo no modification, however great may be the demands of consistency as arising from

the statute as a whole. This is placing the accessory before the principal, and making the means the point of construction instead of the end. It cannot be doubted that this section was introduced into the act for the purpose of affording the amplest means of accomplishing the object of the statute, and not to cover a possible opportunity to recall or destroy what had been given or created by it. The limits to which a power is subjected by the act creating it, often, no doubt, define the character of the power. Here the limit imposed in favor of stockholders primarily suggest, that the power was intended to affect matters in which the stockholders, as such, might have an interest, that is the corporate rights, property and franchises. To stretch this power beyond this definition is to give it an unlimited authority over other vested rights than those expressly reserved, and such a construction is not admissible without stronger grounds of necessity than such as are presented by the present case. We have been referred to various decisions upon the statutes of other states as bearing on the question, but there is no obscurity in the act sufficient to render it necessary to go beyond its text for its construction. It must be concluded, from the foregoing, that the power reserved was not intended to affect or destroy the vested rights of bond and coupon-holders created under the act in question, and that any subsequent law destroying such vested rights or impairing the securities by which they were held, must be regarded as impairing the obligation of a contract made by said act, and, therefore, void in its operation upon such contract. The construction here put upon the act of 1856 is not in conflict with the decision of this court in *Hand v. Railroad Company,* 5 *S. C.* 182. The rights involved in that case were the same as those presented in the present appeals, but the court declined to pass upon such rights, as the case was not in a condition for that decision. It is true that the late Chief Justice, who delivered the opinion of the court, said : " The plaintiff here claims to be subrogated to the rights of the state, and unless he can prevail in his assertion, the foreclosure, for the purpose of providing the means of paying his demand set up in the complaint, could not be ordered ;" but the claim to subrogation was the only view of the plaintiff's case that was then pressed before the court.

That the court did not then intend to hold the plaintiff to this narrow view of his rights, is evident from the last paragraph of the opinion, which says: "We do not intend to define the nature of the issues which may properly arise under the pleadings, or to limit the control of the Circuit Court over the case."

Neither does the present construction of the act of 1856 conflict with anything decided in *State* v. *Railroad,* 8 *S. C.* 129. The question in that case of a general character was, whether in the distribution of assets derived from the sale of corporate property, bondholders having liens under bonds not yet due, could come in equally with the holders of coupons detached from such bonds that were overdue. The Chief Justice, in that case, in commenting on the act of December, 1857, (12 *Stat.* 612), which contains language in regard to another railroad similar to that, the subject of the present discussion, says: "The mortgage was held by the state, and they ('the bond and coupon-holders') were entitled to no relief through its foreclosure; but by a resort to the equitable doctrine of subrogation, which entitles the creditor to the security which the guarantor took for his own protection." This was simply affirming the only view of construction of the act that was claimed or discussed in that case. The question, whether under that act bondholders had any higher rights than the equity referred to, was not discussed, nor could it well be, as the contest was between bond and coupon-holders, who both stood in the same rank of priority, as far as that question was concerned. The observation of the Chief Justice was illustrative merely, and not necessary to the decision of the case, and cannot be regarded as decided law.

The next question to be considered is, whether the holders of bonds or coupons, who took advantage of the provisions of the act of 1869, (14 *Stat.* 201), contained in the third section thereof, are estopped from asserting the full measure of rights conferred by the act of 1856. The principal object of the act of 1869 was to enable the Savannah and Charleston Railroad Company (the new company) to borrow money to complete the repairs of the road, which was partially destroyed by events connected with the late war.

The third and sixth sections are those with which the present

question is concerned. The third section is as follows : " That the said company is hereby further authorized and required to fund and redeem the coupons for interest of the bonds of the Charleston and Savannah Railroad Company, guaranteed by the state, now past due, and that may fall due on or before the first day of September, 1869, by issuing therefor an equal amount of their bonds, with coupons attached for interest, payable semi-annually, at the rate of seven per cent. per annum, and the principal to become due in twenty years after the date thereof; and the payment of the said bonds, so to be issued in substitution for interest coupons, shall be guaranteed by the state in the same manner and as fully as the said original bonds of the Charleston and Savannah Railroad Company are now guaranteed, subject, however, to the provisions of Section 6 of the act."

The sixth section here referred to reads as follows : " That the present lien of the State of South Carolina on the said road shall, upon the issue of the bonds provided for in and by the first section of this act, be postponed and become a second lien, which said second lien shall extend over and cover the whole road, its outfit and real estate, as fully as is already provided by law ; the said road shall be completed by the first of January, 1870."

The bonds referred to in the sixth section, which are to have a first lien upon the whole road and outfit, are those authorized by the second section of the act to carry out the authority conferred by the first section to borrow money for the purpose of extending and rebuilding the road. Can the persons taking advantage of the provisions of the third section by presenting coupons for interest, issued under the act of 1856, and fundable under this section, be permitted to claim and make available, for the payment of the bond and coupons held by them, the original lien or mortgage created by the act of 1856? To answer the question it is necessary to put a construction upon the provisions of the act of 1869, as bearing on the continuance of the lien created by the act of 1856. It cannot be denied that the act of 1869 is, in effect, an assertion on the part of the legislature of its exclusive control over the lien created by the act of 1856. No attempt has been made in argument to point out any features of this act that will bear the construction of intending to reserve the rights

of bond and coupon-holders under the act of 1856, where they
do not choose to accept the provisions of the third section. In-
deed, an opinion of the then attorney-general is produced, which
appears to have been prepared to inform the legislature, while,
as a bill, it was on its passage, that holds the control of the state
over the lien created by the act of 1856, to be exclusive and
absolute. Two circumstances may be inferred from the opinion,
coupled with the language of the act as passed—first, that the
question of the exclusive right of the state to control the lien
acquired under the act of 1856 was involved in the passage of
the act; and, second, that the judgment of the legislature was
that such was the nature of the rights of the state, and, as a con-
sequence, it could, at its pleasure, destroy or postpone such lien.
With this conclusion in view, it is not difficult to put a construc-
tion on the intent and meaning of the third section in its bearing
on the effect of refunding. It is too clear for argument or the
citation of authorities, that one taking a provision made for
himself by a statute, must take upon the condition upon which
it was offered. This principle equally applies to express condi-
tions, and such as may be fairly implied from the terms of the
statute. The act of 1869 was a contract in its bearing on the
rights of all parties who should take its advantages, and, as such,
they are precluded by the principles of legal estoppel from aver-
ing against their obligation, voluntarily assumed upon a valua-
ble consideration.

The third section, in terms, points to the sixth section as
having a controlling influence upon its provisions, and the sixth
section asserts, in plain terms, the exclusive and absolute charac-
ter of the rights of the state, as it regards the ownership of the
lien or mortgage created under the act of 1856. If the view
just stated be correct, then the coupon-holder, refunding, is in
the position of one contracting with another, who claims a certain
right to obtain advantages which could not be obtained except
upon the concession of such claims, and cannot afterwards dis-
pute such right. In such a case he would be precluded, on
strictly legal principles, from asserting such title to be in him-
self against the terms of his contract.

It may be proper to remark, as bearing on the question,

whether the correct statement of the position of the state and the coupon-holder, refunding, has been made above, that the assertion of the title of the state is accompanied by no circumstance or declaration capable of doing away or diminishing its force, and on which a construction can be placed like that already placed on the act of 1856.   In that case language was employed that included the bondholder in the assertion of the title to the lien, while here he is expressly excluded therefrom.

Section 6 expressly assumes to deal with the lien to the exclusion of any right therein on the part of the bond or coupon-holder, and this section must be regarded as, in express terms, entering into and forming part of the contract arising by virtue of the act on the part of the coupon holder funding under the third section.   The view here taken having placed the effect of the act of 1869 upon the legal principle of estoppel, as affecting those bound by covenant or contract, it will not be necessary to refer in this connection to the equitable principles of estoppel and the elaborate learning connected with that subject.

The referee, and the court sustaining his conclusions, hold that the effect of the act of 1869 on those funding coupons thereunder, was confined to the coupons so funded, and did not preclude parties having funded coupons from afterwards asserting their original rights as it regards the bond and other coupons not so funded.   The correctness of this conclusion will next be considered.

The exact question is, whether one having a bond of the class of 1856, and, also, coupons of the same class, whether detached or otherwise, and funding such of said coupons as have matured under the third section of the act of 1869, can be regarded as having accepted the provisions of that act, as well as it regards such bonds and immature coupons as the coupons that are matured and actually funded.

The bonds and their coupons constitute a single obligation. *State* v. *Railroad,* 8 *S. C.* 163.   The coupon merely evidences the obligation collaterally, as it regards one of its incidents.   The act of 1869 operates upon the entire obligation, both principal and interest.   One who accepts its provisions for one purpose,

necessarily accepts it for all purposes, for its provisions are not capable of severance.

When one claiming upon an obligation for principal and interest accepts interest under a composition in terms assuming to affect the conditions upon which the same is due, it must be regarded as accepting the terms of composition in their whole scope. This conclusion is so obvious that it does not require authority or illustration. It depends upon the principle that when a contract is one and indivisible, if it takes effect at all, it must do so as to all its parts. This does not preclude the possibility of severing the terms and conditions of a contract, but that depends upon mutuality of consent, while in the present case there is no evidence that the state has assented that the act of 1869 may take effect otherwise than according to its entire scope and purpose. It would follow that one funding coupons under that act must be regarded as bound by its terms as it regards any bonds or coupons held by him at the time of funding of the same class, at least with the coupons funded. The case before us does not enable us to apply this principle to the facts of the case; we can, therefore, only set aside the conclusion of the Circuit Court to the extent that it conflicts with the conclusions just stated, and the exact application of the principle laid down must be made upon a further hearing, on which such evidence may be introduced on that point, as the nature of the case demands.

The next question is, whether the holders of the six per cent. bonds and coupons are estopped, in equity, from asserting the lien created by the act of 1856, in consequence of their failing to actively oppose the passage of the act of 1869. The equitable estoppel, the operation of which is claimed in this instance, is usually allowed on two grounds: 1. Where there is a concealment, studied or negligent, of a material fact, to the prejudice of the party alleging the estoppel. 2. Where there are facts and circumstances implying the consent or acquiescence of the party claimed to be estopped.

It cannot be contended that at the time the act of 1869 was passed there were any facts material to be known by the parties seeking and desiring the passage of that act, and not known to them, but which the holders of the bonds and coupons, issued

under the act of 1856, knew and improperly withheld, to the detriment of the rights of the former. The matter of difference in question turns on the construction of the act of 1856 wholly, apart from the question of estoppel. The facts were all known. The memorialists who asked the passage of the act of 1869, claimed that the bond and coupon-holders, under the act of 1856, had no lien as security on the property of the company, but had recourse on the guarantee of the state alone, and that the state could dispose of the security at its pleasure. This was the matter passed upon by the legislature, and decided in the interest of the state. The concealment of material facts cannot, therefore, be alleged as the ground of estoppel.

If, then, the doctrine of equitable estoppel is applicable to the case, it must be on the ground of presumed consent or acquiescence. If a party having title to property, or a right in respect thereof, permits another to exercise authority over such property, or deal with such right, the latter shall not be subjected to damages by reason thereof, for *volenti non fit injuria*. This is a well-known legal principle, and, under its operation, a license to use both real and personal property is recognized as existing at law, both by deed or other writing under seal and by parol, and is also presumed from the conduct and relationship of the parties, when not in terms expressed. This principle, in an expanded form, lies at the foundation of the equitable doctrine of estoppel by acquiescence. The grounds upon which equity upholds the action of one who deals with the rights of another in a manner inconsistent with the legal proprietorship, embrace the following particulars:

1. There must be a right, legal or equitable, held by one and exercised by another.

2. Such exercise must have been in good faith, and in the belief of its rightfulness, and its failure must involve the loss of a valuable consideration.

3. The actual proprietor must be chargeable with wrongful conduct, tending to induce such interference with his rights, either by misrepresenting or withholding the truth of some fact, or by conduct warranting a belief of his assent thereto.

*Duke of Leeds* v. *Amherst,* 22 *E. C. R.* 123, (2 *Phill.*)  In

this case Lord Cottenham says: "If a party having a right stands by and sees another dealing with the property in a manner inconsistent with that right, and makes no objection while the act is in progress, he cannot afterwards complain."

This is a broad and altogether unlimited statement of the proposition, but fairly includes all the grounds above stated. The right involved in that case was that of a tenant in tail to prevent waste. As that case was not brought within the principle in question, a more limited statement of the rule was not called for.

*Storrs* v. *Barker*, 6 *Johns. Ch.* 166. In that case Chancellor Kent stated the rule in its application to one having title, yet encouraging a purchase from another person who had no title. He says: "When one having title acquiesces knowingly and freely in the disposition of his property for a valuable consideration by a person pretending to have title, and having color of title, he shall be bound by that disposition of the property, and, especially, if he encouraged the parties to deal with each other in such sale and purchase." The terms "knowingly and freely," as here used, exclude all possibility that the party standing by was acting in good faith, and are, in their effect, equivalent to the declaration that the conduct of a party in such cases must be wrongful. The distinction between legal and equitable estoppel must be here borne in mind. The former, when arising from the specific acts or general conduct of parties, proceeds in harmony with their declared or presumed intentions, and is enforced as such in equity as well as at law, while equitable estoppel, in the strict sense, being based on the idea of fraud, proceeds against the intentions of the party, and upon the inferences that the party claiming the estoppel had a right to draw from such conduct. We are dealing altogether with the question of equitable estoppel, which rests on the idea of wrong, and aims to defeat the intention of the wrong-doer rather than to uphold and enforce it. Chancellor Kent further says: "It is deemed an act of fraud for a party conversant all the time of his own rights to suffer another, ignorant of that right, to go on, under that ignorance, and purchase the property or expend money in making improvements upon it;" but he also holds that the party sought to be estopped cannot plead that he was ignorant of his legal rights in the mat-

ter. This last position is reconcilable with the statement that precedes it, that fraud is the basis of the equitable doctrine, as the assertion of title, after permitting an act inconsistent with it, through ignorance of such title, would tend to work all the consequences of a fraud on the opposite party, and thus make a case for the interference of equity as clear as if fraud actually lay in the intentions of the party while thus standing by. In that case an injunction was allowed to prevent one having legal title from recovering in ejectment.

*Hobbs* v. *Norton,* 1 *Vern.* 136. In that case a party ignorant of his right to claim an annuity encouraged its purchase of another party, and was held estopped from afterwards setting up his title as against the purchaser. The Lord Keeper held " that it was a negligent thing in him not to inform himself of his own title, that thereby he might have informed the purchaser of it, when he came to inquire of him, and, therefore, decreed Sir George to conform the annuity to Hobbs." Evidently this does not mean that every person ignorant of his legal rights must be deemed negligent, but that, under the facts before him, such negligence appeared. In that case the foundation of the relief granted was the wrong of the legal owner. The case excludes the idea that only actual and intentional fraud is sufficient to authorize such relief; still it is not in conflict with the general principle that fraud is at the basis of the remedy, for an attempt to gain advantage from a wrong is in the nature of fraud, having the same consequences, and often becomes actual fraud.

*Hundson* v. *Cheyney,* 2 *Vern.* 150. In that case, one having title and encouraging the plaintiff to purchase from a third party was held estopped, notwithstanding that ignorance of title was urged as an excuse. It does not appear that the defendant was ignorant of the facts upon which his legal title rested, and it may be assumed that the ignorance alleged was ignorance of the law, which cannot be affirmed.

*Raw* v. *Pote,* 2 *Vern.* 239. In that case the relief was granted, on the ground of actual fraud in encouraging the purchase.

*Chamberlain* v. *Railroad,* 92 *U. S.* 299. One was held estopped from disputing rights claimed under an act of legislature, where he had actually urged before the legislature the adoption

of the measure secured by such act. The case stands on the same ground of principle with those previously examined.

*Chapman* v. *Chapman, 59 Penn.* 214. The rule applied in that case was stated as follows: "Positive acts, tending to mislead one ignorant of the truth, which do mislead him, to his injury, are a good ground of estoppel; and ignorance of title on the part of him who is estopped will not excuse this act." Again: "Silence will postpone a title when one should speak out, when, knowing his own right, he suffers his silence to lull to rest instead of warning of danger; when, to use the language of the books, silence becomes a fraud. * * * He who is led by such silence, ignorantly and innocently, to rest upon his title, believing it to be secure, and to expend money and make improvements upon his property without the timely warning, he should have had to dispel his illusion, will be protected by estoppel against recovery." It was held that marriage was a valuable consideration within the rule as to estoppel.

The distinction here drawn between the wrong accomplished by active participation and that by guilty silence, illustrates the foundation of the equitable doctrine. When one seeks to overthrow the state of things which he has actually brought about, to the prejudice of another, a clear wrong is perpetrated, and it is no excuse that he was ignorant of his title, for that ignorance should prejudice him alone as the result of his fault or misfortune; but its consequences should not be cast off from himself upon another, for each one should bear the consequences of his own fault or misfortune. But, if silence only is alleged, knowledge of his right must be made to appear, for the possession of such knowledge is an essential element of the question of the wrongful character of such silence. The cases already stated sufficiently illustrate all the features of the proposition which they are here adduced to support, and it is unnecessary to make further citations.

Do these principles apply to the conduct of the bond and coupon-holders under the act of 1856? Can they be said to be chargeable with guilty silence, and that the appellants are in their present position through their misconduct?

We are dealing at the present time wholly with a class of indi-

viduals between whom, as far as we know, there is no other
ground for associating them than such as arises from the fact that
they are the holders of instruments for the payment of money of
a certain class payable to bearer.

The separate action of the individuals that compose the group
is not before us, except in one or two instances, to which the tes-
timony relates. The case does not contain the findings requisite
to enable us to say whether any particular individual of this class
under consideration has, by his misconduct, subjected himself to
the rule of estoppel. As the case stands the only inquiry
we can make is, whether the entire class of bond and coupon-
holders, under the act of 1856, are estopped by reason of silence,
when, as it is contended, they should have given active opposi-
tion to the act of 1869. It is not shown that the class in ques-
tion are chargeable, as a class, with having encouraged the passage
of the act. The question that presents itself at this point is very
simple, and may be reduced to these simple terms: When one
goes to the legislature and asks the passage of an act to take
away my rights, am I bound to go there, assuming that I have
knowledge of the fact, and oppose such action? Very clearly
no such obligation rests upon me. If the judgment of a court
cannot prejudice my rights, unless I am a party before it, even if
I have actual knowledge of the pendency of the proceedings
before it, much less should the proceedings of a legislative body,
not primarily clothed with power to divest individual rights,
have such binding force against me. The fact that the state was
an interested party makes the case still stronger: The state had
no right to assume the consent of the bondholders, from the fact
that they did not appear in the lobbies of the general assembly
in opposition to the measure. It is not to be presumed, and it
does not appear, that any case exists where a party has been
charged with guilty silence, as it regards a particular transaction,
unless present in person or by agent, at the time and place of
such transaction, or involved in correspondence connected there-
with. It does not appear that the bond or coupon-holders of
1856 occupied this position, and it is for those who allege guilty
silence to prove it to be such. Knowing these persons only as a
class, we cannot apply to the case any presumption that would

even charge them with knowledge of the pendency of the pro-
ceedings before the legislature.    In individual instances such
knowledge may have been possessed, but it is impossible to hold
that their silence was, in itself, evidence of wrong, or in any sense
equivalent to fraud.

Neither the state nor the parties who have come in under the
act of 1869 can allege ignorance of the legal effect of the act of
1856, for that would amount to ignorance of the law; and if
ignorance of one's rights does not protect from estoppel him who
actively participates in the transaction, it ought not to help those
seeking such relief against others.    It is clear that the holders of
bonds and coupons of 1856 were not bound to oppose the pas-
sage of the act of 1869 in the legislature, but that they are justi-
fied in waiting until they could defeat its operation in the courts,
and, therefore, they are not estopped on the ground claimed.

The foregoing conclusions establish the proposition that the
bond and coupon-holders, under the act of 1856, took a first
mortgage or lien upon all the property of the old company in-
tended by that act to be subjected to such mortgage or lien, which
the legislature had no right to destroy or postpone, as such an
attempt was in violation of the provisions of the constitution of
the United States and of this state, forbidding the passage of a
law impairing the obligation of a contract, and which lien, as it
regards this class of bond and coupon-holders, other than those
refunding interest, as before stated, has not been alleged and proven.

Whether individual members of such class have lost the right
to claim the enforcement of such lien, has not been determined
by the report of the referee nor the decree of the Circuit Court,
and cannot be considered here.

Objections have been made to the claims of the bond and
coupon-holders under the act of 1856, both as a class and as
individuals, that will be considered.   It is alleged that coupons
of that class have been paid by the defendant corporation, after
the road had been rebuilt, with means derived from bonds issued
under the act of 1869; and it is claimed that this worked an
estoppel as affecting the individuals accepting such payments.
The evidence and the findings do not show the fact to which this
objection relates.    If, however, it is meant by the objection that

payment, accepted by holders of bonds or coupons under the twentieth section of the act of 1866, constitutes an estoppel as to any other bonds or coupons held by the persons accepting such payments, then the objection is without legal force.   The act of 1866, (13 *Stat.* 438), incorporated the defendant corporation for the purpose of exercising the rights and franchises formerly appertaining to the old company, and sold for foreclosure under a mortgage subsequent to the lien of the bonds and coupons of 1856.   Section 20 of the act provides " that the company hereby formed shall assume and be held liable for the payment of the six per cent. interest-bearing bonds, whereon the guaranty of the state has been endorsed, and the lien of the state is, in every respect, preserved and hereby reaffirmed." This provision, by virtue of the acceptance by the defendant corporation of the benefits of the act, became a binding obligation on such defendant to pay the coupons and bonds of 1856 at maturity.   It was, in effect, the same as a covenant on the part of a purchaser from a mortgagor to pay the mortgage debt, although enlarged in its operation, as such, through the fact that it was made such by a public statute, and not a covenant between parties alone.   The act contained nothing inconsistent with the rights of the bond and coupon-holders of 1856, but, on the contrary, expressly reserved the rights in which they were interested.   Such bond and coupon-holders, in demanding and receiving interest, took nothing on any express or implied condition of waiving any antecedent right, and, consequently, are neither estopped at law nor in equity. The question whether the ability of the defendant corporation to pay arose from money borrowed under the act of 1869, or otherwise, is altogether immaterial.

It is objected that it does not appear that the bond and coupon-holders of 1856 have made an attempt to obtain payment of the state, the endorser of their bonds.   A demand, without the right to prosecute at law, would be fruitless and a mere ceremony, and, as such, its absence, if established, could not give rise to any equity.

The defendant corporation, under the twentieth section of their charter, assumed to save the state free from liability on its endorsement by contracting to pay such indebtedness, and neither

the defendant nor the classes of creditors that derive their liens under such defendant corporation can claim in equity that the primary duty of payment rests upon the state and not upon the defendant corporation.

It is contended that the bond and coupon-holders of 1856 have a double security, should they be held to have a lien or mortgage under the act of 1856, namely, that lien on the one hand, and the pledge of the faith and funds of the state on the other, and that appellants have only one of their securities, and equity requires the party having a double security to first exhaust that which will not injure the other party protected by the same securities. Although the proposition is in the face of the covenant of the defendant corporation to pay, primarily, yet it will be considered. The promises of the state to pay money, incapable of enforcement by suit, cannot, with any propriety, be regarded as a security within the meaning of the rule of equity invoked. Equity cannot lay hold of and apply such a demand. It would be a much stronger case to hold that one that has a bond secured by a mortgage holds a double security within the sense of the rule of equity, so that a subsequent mortgagee might enjoin proceedings to foreclose the prior mortgage, on the ground that the prior mortgagee was bound first to exhaust his remedy upon the bond, yet such an application of the rule of equity has not been made. Much less can an imperfect personal obligation, that is, one incapable of legal enforcement, constitute such a security in the contemplation of equity.

The view taken of the rights of the bond and coupon-holders renders it unnecessary to examine those objections that raise the question of the right of a trustee to charge his *cestui que trust* with moneys expended for the preservation of the trust estate. Whatever rights these bond and coupon-holders acquired under the act of 1856 they acquired in their own right at the moment they became such holders, and nothing was left in the state, as it regards that class of liens on which the state could exercise the powers of a trustee.

It is contended that the holders of the bond and coupons of 1856 owed some duty to the bond and coupon-holders of 1869 which has been neglected, and, therefore, they should be barred

and estopped from making their demand. It is said that they stood by and saw the money obtained under the act of 1869 expended for the benefit of the security, with knowledge of all the facts, and gave no notice of their demand. This objection is substantially answered by what has already been said in reference to their silence while the act of 1869 was upon its passage in the legislature. It certainly cannot be contended that when a mortgagor, having borrowed money on a second mortgage for the purpose, undertakes to expend such money on improvements, or even for the preservation of the mortgaged premises, the first mortgagor, with a recorded mortgage, must come forward, either with objection or at least notice of his claims, at the peril of having his security postponed to the junior one.

The right of the bondholders of 1856 was derived under a public statute, of which all were bound to take notice, and stand, as to subsequent encumbrancers, on the same footing as that of a prior recorded mortgage to a subsequent one.

It is contended on behalf of the holders of the bonds issued under the act of 1869 for the redemption of coupons matured upon the bonds of 1856, and which bonds are entitled by that act to a guaranty of payment by the state, that they are entitled to a decree against the state for the amount due from the state on its guaranty. Such a decree would be collateral to the relief demanded in the present action, and, therefore, is not necessarily called for, even if admissible in itself. But the state guaranteed nothing by the act of 1869 beyond authorizing an endorsement of its pledge of payment as surety on the bonds issued in lieu of coupons of bonds that previously held such pledge. Such a guaranty cannot be directly enforced by suit against the state, and, consequently, cannot be enforced in an indirect way as collateral to other issues.

There was no error in the ruling that the bonds issued under the act of 1869, for the redemption of coupons of 1856, were not entitled to any lien on the property of the company. It has already been held that the act of 1869 was, in effect, an assertion on the part of the state of exclusive control over the lien or mortgage created by the act of 1856, and that the holders of bonds and coupons, who accepted the benefit of the act of 1869, assented

to, and are bound by this view of the act of 1856. It would follow that they can claim nothing but what the act of 1869 recognizes by way of security. In that act the state waives its lien under the act of 1856 in behalf of the holders of bonds issued under the first section of that act which does not cover the redemption bond. Consequently the position of the redemption bonds is this : The property of the company is liable, as far as the bonded debt is concerned, in the first instance, for the payment of the bonds and coupons of 1856, where the rights of the holders have not become subsequently impaired ; secondly, to the bonds issued under the first section of the act of 1869 ; thirdly, to indemnify the state upon its guaranty on the bonds and coupons of 1856, and on those issued under the act of 1869, which have upon them the endorsement of the guaranty of the state. This would leave the state bound as surety on the redemption bonds, and holding a third lien, wholly subject to its control for its protection from liability thereunder.

It does not appear that any case was made, or attempted to be made, in the Circuit Court for applying the principles of subrogation as between the state as surety and the holders of the redemption bonds holding the state as surety, and that question cannot be considered as opened by the appeal.

It is clear that the reasoning already applied to the act of 1856 to show that the lien of the state was intended equally for the holders of bonds as for itself, is inapplicable to the act of 1869, which has a manifest intent to the contrary, therefore there is no ground for holding that the lien of the state, reserved by the act of 1869, as it regards the redemption bonds, enured to the benefit of the holders of such bonds, so as to give them an independent right to enforce it.

It is also contended in behalf of the holders of the redemption bonds, that the state, " as surety, has a right and is bound to set up the coupons which have been paid and redeemed by its guaranty of the Savannah and Charleston railroad bonds of 1869, given for these coupons." It is certain that the state could not set up these redeemed coupons as against the bonds issued under the first section of the act of 1869, for that would violate the terms of the security given by that act to the holders of such

bonds. Nor could such an equity be set up against the older legal and equitable right of the holders of the bonds and coupons of 1856, who have not forfeited their rights as such, as that would defeat the rule that where equities are equal the legal right will prevail.

It does not appear that this demand of the holders of the redemption bonds was brought forward until after the Circuit decree was rendered, as no reference to the subject is found in the exceptions to the referee's report, and its first appearance in the case is among the grounds of appeal. It is too late to raise such a new and distinctive equity after decree. This conclusion disposes of the further exception that the state, having failed to set up such redeemed coupons, the holders of the redemption bonds can do so by way of subrogation to the place of the state.

As it regards the claims of the estate of G. A. Trenholm and Rev. W. T. Potter, the views of the referee are approved, so far as he sustains the right of the claimant to enforce the mortgage. It remains to consider whether the conclusions of the referee, as to the relative priority of the liens under the act of 1856, and under the mortgage through which the defendant corporation claims title and the mortgage in question, are correct.

The claims of the estate of Trenholm and Potter arise on bonds secured by a purchase-money mortgage on lands sold to the Charleston and Savannah Railroad Company. The subject of this sale was a body of land, only a portion of which was required for the use of the railroad. The purchase of the land was made on the 4th of March, 1858. The date of the bonds and mortgage does not appear, but may be assumed to be the same as that already stated, namely, March 4th, 1858. At the date of this mortgage it is claimed that there were two liens outstanding against the property of the Charleston and Savannah Railroad Company, namely, that created by the act of 1856 in behalf of the state and the holders of securities issued under that act, and the mortgage to secure an issue of bonds, under which the defendant corporation obtained title.

The first question presented is, whether the lien of the act of 1856 can prevail over the mortgage held by the estate

of Trenholm and Potter as a first lien on the land so purchased and mortgaged.

This will be considered, first, as it regards the portion of the land so purchased, which was required and used for the immediate purposes of the railroad, as such; and, second, as to that part of the purchased land that was not required for the direct purposes of the railroad. The lien created by the act of 1856 covers "the entire road, including the stock, right of way, grading, bridges, masonry, iron rails, spikes, chairs, and the whole superstructure and equipments, and all the property owned by the company, as incident to or necessary to its business." *Act,* 1856, § 4.

This lien was to be created and take effect "when the whole of said road shall be completed."

It does not appear at what date the whole road was completed. We are led to infer that the date of the completion of the road was subsequent to that of the execution of the bonds and mortgage of Trenholm and Potter, inasmuch as the object of the transaction was to secure the right of way for the road, and the road could not be completed in conformity with the requirements of the act of 1856 until the right of way had been acquired throughout its full extent. We are at liberty to draw this inference, as it is in support of the decree, which must be presumed right until the contrary is made to appear. Prior to the mortgage, then, the only liens actually created under the act were those that arose on each separate section of the road of twenty miles, at its completion, to the extent required by the act of 1856, and upon the endorsing of the bonds covering that section. The lien given on each section was "upon said section so prepared, as aforesaid, including the road bed, right of way, grading, bridges and masonry upon all the stock subscribed for in said company, and upon said iron rails, chairs, spikes and equipments, when purchased and delivered." This lien does not include the general property of the company. It must be concluded, for the reasons already stated, that the section that includes the land mortgaged was not completed for want of full right of way until after the mortgage was made. The case does not show to what section of the road the purchased land in question belonged, but

that is unimportant under the view here taken. It follows that the mortgage took effect prior to the attaching of the lien, as it regards the land included in and forming the road bed and so much lying contiguous thereto as was reasonable for the purposes of the railroad, the test as to the quantity being whether it could be separated from the railroad franchise without impairing the value and usefulness of the latter. As it regards so much of the mortgaged land as properly appertained to the railroad, as such, a question arises whether the provisions of the act do not operate to create a lien relating back to the date of the passage of the act, as it regards all other liens created or attempted to be created after that date. This question arises under two aspects of the act. The first is that the act provides that no lien shall exist at the time the bonds are so endorsed, other than that created by the act itself, and requires that evidence of the non-existence of such additional lien shall be furnished before the bonds shall be endorsed. It is not necessary to consider whether it was not competent for the legislature to frame the act of 1856 in such a manner that no other lien than that intended by that act could be effectually created after the date of the passage of the act so as to take precedence of the lien created by the act itself, for we will find that the act does not assume to accomplish any such purpose. This is evident from the fact that evidence of the non-existence of liens was required which would not be necessary if the act itself was intended to operate to prevent the possibility of the existence of any such liens. Nor can the purposes of the act be extended, in this respect, beyond the limits of necessary implication, for the reason that it would then interfere with common rights incident to dominion over land.

The other view of the act is, that all parties had notice, by means of the act, of the intention of the legislature that such act should operate to create a lien superior to any other that might exist, and having such notice could not defeat the reasonable intent of the act. The answer to this is, that the act stops short of indicating such a purpose, and can only take effect according to the purposes declared or necessarily to be implied. Besides, the parties selling the land and taking back a mortgage for the purchase money, could not, with certainty, know that the corpo-

ration would ever apply for the endorsement of the bonds so as to interfere with a lien for the purchase money. The corporation had the right to apply for the endorsement of the bonds upon the terms stipulated in the act, but were not bound to do so. It, therefore, appears that the object of the statute was not absolutely to create a lien at all events, but to give the corporation voluntary power to bring such lien into operation on certain contingencies under their control. The act being in this respect permissive and not mandatory, there is no ground for saying that the creature of an independent lien by the defendant corporation defeated the intent of the statute, although the subsequent act of taking endorsed bonds, with such lien outstanding, may have tended to produce that effect, but of that none of the parties complain.

The next question is, whether the mortgage of January, 1858, under which the defendant corporation holds title, and which was antecedent in point of time to the purchase money mortgage in question, is entitled to priority over that mortgage.

It cannot be doubted that a railroad corporation may mortgage after-to-be-acquired property. *Dunham* v. *Railroad,* 1 *Wall.* 259; *Pennock* v. *Coe,* 23 *How.* 117; *Pierce* v. *Railroad,* 24 *Wis.* 551. So, if it makes a good mortgage of the land, and afterwards purchases personal property, giving a lien thereon for the purchase money, and such personal property becomes attached to the soil, being used for the construction of improvements upon it, the lien of the mortgage of the land prevails over that made for the security of the purchase money of the personal property. *Railroad* v. *Cowdrey,* 11 *Wall.* 459. But to hold that a railroad company may make a mortgage of land to be acquired so as to defeat a purchase-money mortgage of land subsequently acquired, stands on an entirely different footing and cannot be admitted.

The grounds already presented would as well dispose of the question as it relates to the land mortgaged other than that required for the road bed and its appurtenances, but it is not necessary to resort to such reasonings, inasmuch as property held by a railroad company other than for the immediate uses of the railroad, stands on the same footing as lands in the hands of a natural person. Doubtless it might be otherwise when a pecu-

liar character has been impressed upon such holdings by the law governing the corporation, but such is not claimed to be the case here.

The Charleston and Savannah Railroad Company having given a purchase money mortgage for the land, no obligation or lien affecting that company or its property can be interposed prior to such purchase-money mortgage. The mortgage of Trenholm and Potter was properly upheld by the decree as a first lien as to such mortgaged property. So far as it regards that portion of the mortgaged land that was requisite for the use of the railroad, as such, the claims of the estate of Trenholm and of Potter must be confined to the fund arising from the sale of the railroad as a whole, and for that purpose there should be an inquiry to ascertain what ratable proportion of the whole fund arising from such sale would properly represent the relative value of that portion of the mortgaged land. The rest of the mortgaged land in question must be sold separately, and the proceeds applied on the foregoing principles.

The next question to be considered is, the right of the state to tax the property of the defendant corporation. The act of 1869 required the road to be completed by the first of January, 1870, and provided " that no tax shall be assessed or levied upon the said road until the same shall have been completed."

It is evident that the intent of the act was that the road should become subject to taxation not later than January 1st, 1870, when it was required to be completed.  But the appellants contend that it was not, in fact, completed at that time, and has not yet been completed, and that until so completed taxes cannot be levied under the act. This is virtually claiming that they may disregard one of the provisions of the act and still insist upon the benefit of another, when the two clauses cannot, from their nature, be disconnected from each other. That is to say, that they may claim exemption from taxation on the ground that they have failed to comply with the requirements in regard to the completion of the road. This would be taking advantage of their own wrong. The act cannot be construed as intending any such one-sided advantage.

The referee and the Circuit judge concludes, as matter of fact,

that the road was completed, in the sense contemplated by the act, previous to the imposition of the taxes claimed. This conclusion is based substantially on the idea that it was a substantial conpletion of the road when the terminus at Charleston was reached, at a point opposite to that city, on the Ashley river, and passengers and freight were transferred across the river by boat to that city, and when, by arrangement with another railroad running into the city of Savannah, it was enabled to run its trains over the track of such road for about three miles into the city of Savannah. It is evident that this arrangement put in exercise the franchise of the defendant corporation to carry passengers and freight, for hire, to its full extent, that is, from the city of Charleston to the city of Savannah. Whether the defendant corporation chose to build and own or lease their right of approach to Savannah is immaterial to the question of completion within the meaning of the act of 1869. Under such circumstances, the exemption claimed by the defendant corporation cannot be sustained by any reasonable construction of the act of 1869. That portion of the decree that sustains the imposition of the taxes, should be affirmed.

It was contended in argument that there was no creditor before the court, as plaintiff, who had the right to demand the sale of the road. The state is clearly such a creditor, and has a complaint demanding a sale of the road for the payment of its debts. Although the state has assumed to modify its original position, that fact is immaterial to the questions presented by the appeal, as it has not relinquished its claims for taxes, nor sought to abandon that part of its complaint that seeks the satisfaction of such taxes out of the property of the defendant corporation.

So much of the decree as orders the sale of the road should be modified by a provision that as to all that part of the permanent property mortgaged that lies within the State of Georgia, such sale must be made subject to such liens as have been, or may hereafter be, established under the laws of that state. In this manner the purchaser will acquire all the right of all parties before the court, and be enabled, if it should become necessary, to prosecute such remedies as may be requisite to become invested with that portion of the permanent property situated within the

jurisdiction of the State of Georgia. The movable property in the hands of the receiver, being fully within the jurisdiction of this court, is not subject to the above modification. Subject to the modifications hereinbefore indicated, the decree of the Circuit Court should be affirmed.

McIVER, A. J., concurred.

. HASKELL, A. J. I am unable to concur in the construction given to the act of 1856. 12 *Stat.* 467.

The act is ambulatory in its character and passes over an extended period of time, providing for a succession of progressive events and separate transactions before it establishes the final provision which is to govern the whole as an entirety.

Section 3 is made, by the majority of the court, the key of the construction and to govern the act, but is strictly applicable only to the twenty-mile or fractional division of the road, and the bonds issued for its outfit and completion. For the section is partial in its nature, and antecedent, both in the act and in its legal bearing, to so much of Section 4 as becomes of force on the completion of the whole road, and applies to all the bonds endorsed by the state at any time, issued to effect the completion of the several divisions of the road. Section 4 was part of the contract created under Section 3, and even if, as is held, the lien had vested in the bond, upon its issue for the completion of each fractional division, it so vested subject to the provision of Section 4, and on the completion of the road passed over and vested again in the state, subject to its control under the power reserved in Section 5.

But no such difficulty arises in the view my mind is constrained to take of the act. Section 3 enacts that " the State of South Carolina, upon the endorsing of said bonds, and by virtue of the same, shall be invested with said lien or mortgage," &c. It is immaterial to consider whether "by virtue of the same," refers to the "endorsing" or to the bonds thus endorsed, for, under the view taken, the result would be the same. Section 4 provides that " when the whole of said road shall be completed

the State of South Carolina shall be invested with a lien, without a deed from the company, upon the entire road," &c.

The difference of construction arises upon the meaning of the word "constitute," in the preceding portion of Section 3, by which it is provided "that so soon as any such bonds shall have been endorsed as aforesaid, for the first section of the road as aforesaid, *they* shall *constitute* a lien upon *said section* so prepared as aforesaid," &c.

It is held that this provision, overbearing all other language used in the act, renders the lien accessory to the bond and vests it in the subsequent holder of the bond—the purchaser.

The analogy of a judgment used in the reasoning would be satisfactory if made complete. Thus, if it be enacted that A institute an action, and that the judgment, when entered up in the name of A, shall constitute a lien, and that said lien shall be for the benefit of B, and as soon as established shall vest in B, the cases would be similar. The plain interpretation is, that the judgment held by A would be evidence of the lien, but that the lien itself would be vested in B. "Constitute," in its primary sense, means "cause to stand, set up or establish;" and, in its secondary sense, "compose of, form," which latter is the construction adopted by the majority of the court. And such would be quite admissible were it consistent with the positive language used in other portions of the act, but when it produces inconsistency, the primary meaning, which is entirely in harmony with the rest of the act, should have preference. Adopting, therefore, the word in its primary sense, Section 3 means not that the bonds shall, in themselves, compose or form a lien, but that they shall, by their execution and endorsement, establish or be evidence of a lien. In whom that lien shall be vested is thus left open, and is determined by the second provision of Section 3, so far as regards each fraction of the road, and finally as to the whole road by Section 4, whereby the said lien is invested in the state. The bonds are thus the evidence of the creation of the lien which vests according to the statute.

The view that the vesting of the lien in the state was intended as only a temporary provision, of force only so long as the bonds, after endorsement, remained in the hands of the railroad com-

pany, is refuted by the purpose and provisions of the act, which authorizes the bonds to be endorsed in parcels proportionate with fractional divisions of the road.   The plain object is, (1) to facilitate the completion of the road by sections; (2) to enforce the application of the proceeds of the bonds at the rate per mile fixed by the act; and (3) to insure the completion of the entire road down to the last fraction before the endorsement of the last batch of the bonds.   To effect such purposes the bonds would be sold in the order in which the sections were completed in compliance with the act, and, consequently, would all be in the hands of purchasers before the final completion.   What, then, could be the sense of a provision like that in Section 4, to vest in the state a lien, the title to endure only so long as the bonds remained in the hands of the railroad company, when *ex necessitate*, the bonds must go out of such hands before the accrual of the period to which the provision in Section 4 relates, viz., the completion of the entire road.   The other reasons advanced to aid in the construction of the act are sufficiently met by the view that the guarantee by the sovereign power is superior to any and all class of securities, so long as good faith is observed by the government; and that it will be, is always to be presumed.   From such point of view it would be a detriment rather than an advantage that bondholders should be compelled to exhaust all legal remedies before they could look to the state for the fulfillment of her pledge, and such anticipation would, in 1856, the time at which the act was passed, have diminished rather than increased the market value of the bonds.

I concur in the other points decided, so far as they do not conflict with the views herein expressed.

Decree affirmed.